12 CV 7387

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

-------------------------------------------------------------------x

GYM DOOR REPAIRS, INC. and SAFEPATH
SYSTEMS LLC,

                              *Plaintiffs,*

    - against -

NEW YORK CITY DEPARTMENT OF
EDUCATION, DENNIS M. WALCOTT, as
Chancellor of the New York City Department of
Education, NEW YORK CITY SCHOOL
CONSTRUCTION AUTHORITY, THE BOARD
OF TRUSTEES OF THE NEW YORK CITY
SCHOOL CONSTRUCTION AUTHORITY, THE
CITY OF NEW YORK, JOHN T SHEA, as Chief
Executive Officer of New York City Department of
Education Division of School Facilities, VOLKERT
BRAREN, as Director of Program Management of
NYCDOE, CHRIS COYLE, as Construction Project
Manager of New York City Department of Education,
CHRIS D'ALIMONTE, as Borough Contract Manager
of New York City Department of Education,
THOMAS FANIZZI, as Manhattan Maintenance
Planner of New York City Department of
Education and Division of School Facilities, and
JOHN DOES 1-5, whose names are not presently
unknown, as agents, servants and employees of THE
CITY OF NEW YORK,

                              *Defendants.*

-------------------------------------------------------------------x

Case No.:

**COMPLAINT**

Jury Trial Demanded



        Plaintiffs, Gym Door Repairs, Inc. ("GDRI") and Safepath Systems, LLC ("SPS")

(collectively, "Plaintiffs"), by their attorneys, Tarter Krinsky & Drogin LLP, as and for their

complaint against Defendants, New York City Department of Education ("NYCDOE"), Dennis

M. Walcott ("Walcott"), as Chancellor of the NYCDOE, New York City School Construction

Authority ("NYCSCA"), the Board of Trustees of the NYCSCA ("NYCSCA Board of

Trustees"), the City of New York (the "City"), John T. Shea ("Shea"), as Chief Executive Officer of the Divisions of School Facilities of NYCDOE, Volkert Braren ("Braren"), as Director of Program Management of NYCDOE, Chris Coyle ("Coyle"), as Construction Project Manager of NYCDOE, Chris D'Alimonte ("D'Alimonte"), as Borough Contract Manager of NYCDOE, Thomas Fanizzi ("Fanizzi"), as Manhattan Maintenance Planner of the Division of School Facilities of the NYCDOE, and John Does 1-10 ("John Doe Defendants"), whose names are presently unknown, as agents, servants and employees of the City (foregoing individual defendants are collectively referred to as the "Individual Defendants"), allege as follows:

## INTRODUCTION AND JURISDICTION

1.      This is an action to redress the deprivation by Defendants, acting under color of law, of rights and privileges secured to Plaintiffs by the United States Constitution.  Under Title 42 U.S.C. § 1983 and the First and Fourteenth Amendments to the United States Constitution, Plaintiffs seek legal and equitable relief against Defendants.

2.      The jurisdiction of this Court is invoked under 28 U.S.C. §§ 1331 and 1343 and 42 U.S.C. §§ 1983 and 1988.

3.      Venue is proper in this Court under 28 U.S.C. § 1391.

## PARTIES

4.      At all times relevant, GDRI was and is a corporation duly organized and existing under the laws of the State of New York, with its principal place of business at 3500 Sunrise Highway, Great River, New York 11739.

5.      At all times relevant, SPS was and is a limited liability company, duly organized and existing under the laws of the State of Delaware, with a principal place of business at 3500 Sunrise Highway, Great River, New York 11739.

6.      Upon information and belief, at all times relevant, NYCDOE is a municipal government department with a principal place of operations at, *inter alia*, Tweed Courthouse, 52 Chambers Street, New York, New York 10007, and Defendant Dennis M. Walcott, as Chancellor, is the head of NYCDOE. He is sued in his official capacity only.

7.      Upon information and belief, NYCSCA is a Class C Public Benefit Corporation established pursuant to New York Public Benefits Authority Law § 1727, with a principal place of operations at 30-30 Thomson Avenue, Long Island City, New York, 11101. Defendant NYCSCA Board of Trustees governs and exercises the powers of the NYCSCA. They are sued in their official capacities only.

8.      At all times relevant, the City was and is a municipal corporation organized and existing under the laws of the State of New York, located within the county of New York, State of New York, in the Southern District of New York, and was and is the employer of the various named and unnamed individuals designated as Defendants herein.

9.      At all times relevant, Shea was and is the Chief Executive Officer of the NYCDOE, Division of School Facilities, with his principal place of operations at 44-36 Vernon Boulevard, Long Island City, New York 11101, and is sued in his official capacity only.

10.      At all times relevant, Braren was and is the Director of Program Management of NYCDOE, with his principal place of operations at 180 6th Avenue, Brooklyn, New York 11217, and is sued in his official capacity only.

11.      At all times relevant, Coyle was and is the Construction Project Manager of the NYCDOE, with his principal place of operations at, *inter alia*, Tweed Courthouse, 52 Chambers Street, New York, New York 10007, and is sued in his official capacity only.

12.      At all times relevant, D'Alimonte was and is the Borough Contract Manager of

NYCDOE, with his principal place of operations at, *inter alia*, Tweed Courthouse, 52 Chambers Street, New York, New York 10007, and is sued in his official capacity only.

13.     At all times relevant, Fanizzi was and is the Manhattan Maintenance Planner of NYCDOE, Division of School Facilities, with his principal place of business at 44-36 Vernon Boulevard, Long Island City, New York 11101, and is sued in his official capacity only.

14.     At all times relevant the John Doe Defendants were and are agents, servants, and/or employees of the City and were acting in their official capacity under the color of state law and within the scope of their employment.

## BACKGROUND FACTS

### A.     Education Law §409 (f) and Regulation § 155.25

15.     In or around August 2001, following the tragic deaths of two students in schools located in the State of New York, Governor George Pataki signed Education Law § 409-f, which requires all public and private schools, located in the State to install and maintain safety devices on all electrically operated partition doors.  Education Law § 409-f was specifically enacted to prevent serious injuries or deaths resulting from electrically operated partition doors.

16.     Education Law § 409-f states in pertinent part:

[t]he board of education, trustees, principal or other persons in charge of every public or private school or educational institution within the State, wherein classrooms or other facilities used by the students are found to have electrically operated partitions, doors or room dividers, shall arrange for, and require that:

3.  Every electrically operated partition or room divider shall be equipped with safety devices which, subject to standards established in rules and regulations promulgated by the commissioner, stop the forward motion of the partition or room divider and stop the stacking motion of the partition or room divider when a body passes between the leading panel of such partition or divider and a wall, or when a body is present in the stacking area of such partition or divider.

Any person who disables or directs another person to disable any safety equipment required pursuant to this section shall be guilty of a violation punishable by not more than fifteen days imprisonment, or fine not to exceed one hundred dollars, or both such fine and imprisonment.

(Emphasis added.)

17.    In furtherance of and to enforce Education Law § 409-f, the New York State Education Department promulgated and implemented Commissioner's Regulation ("Regulation") § 155.25, Safety Requirements for Electrically Operated Partitions, which states as follows:

(c)    Minimum construction, maintenance and operation standards for electronically operated partitions. . . . the board of education, trustees, principal or other person in charge of every public or private school or educational institution within the State, wherein classrooms or other facilities used by students are found to have electrically operated partitions, shall ensure that:

(1) every electrically operated partition is equipped with two key operated, tamper-proof, constant pressure control stations that are wired in series, remotely located at opposite ends and opposite sides of, and in view of, the partition, and which are designed and constructed so as to require simultaneous activation of both control stations to operate the partition;

(2) the electric device controlling the operation of the partition is capable of being reversed at any point in the extend or stack travel cycle; and

(3) device(s) are provided for all partitions that will stop the forward or backward motion of the partition and stop the stacking motion of the partition when a body or object passes between the leading panel of such partition and a wall or other termination point, or when a body or object is in the stacking area of such partition;

. . .

(d)    Safety requirements and operation guidelines for electrically operated partitions.  The board of education, trustees, principal or other persons in charge of every public or private school or educational institution within the State shall insure that:

. . .

> (4) safety features <u>shall not be tampered with, overridden or by-passed.  All equipment must be maintained in accordance with the manufacturer's instructions, including the manufacturer's recommended service interval,</u> and records of such maintenance shall be permanently retained at the district or private school.  All equipment shall be installed in a fail-safe manner such that the failure of any safety device shall render the electrically operated partition inoperable until such device is repaired . . . .

(Emphasis added.)

18.     As set forth in paragraph 15, *supra*, Education Law § 409-f and Regulation § 155.25 were enacted following the deaths of two students, both of whom were crushed by electrically operated partition doors without the safety systems prescribed by Education Law § 409-f and Regulation § 155.25.  Enforcement of and compliance with Education Law § 409-f and Regulation § 155.25 are critically important because electrically operated partition doors without safety systems in place pose serious threats to the life and safety of students and/or any individuals who come in contact with them.

19.     Upon information and belief, in furtherance of Education Law § 409-f and Regulation § 155.25, in or around 2001 and 2002, the State initially passed a funded mandate, which appropriated approximately $37.5 million in State funds for the installation safety devices in each and every school within the State, including, but not limited to, the City, using electrically operated partition doors.

20.     Upon information and belief, additional and further funding in excess of $30 million has been appropriated for ongoing compliance with Education Law § 409-f and Regulation § 155.25.  These compliance measures include installation, service, repair and/or maintenance of safety systems.

**B.     GDRI and the Safe Path System**

21.  GDRI, through its president, Stephen Cole, designed the "Safe Path System" (the "Safe Path System"), a life safety detection system of electric folding doors and partitions, which set the standard for the industry.  A copy of the Safe Path System specifications is annexed hereto as Exhibit "1."  At all relevant times, the Safe Path System has been the premier life safety detection system in the market.  The design, function and specifications of the Safe Path System meet the standards required by Education Law § 409-f and Regulation § 155.25.

22.  Plaintiffs have intellectual property rights related to the Safe Path System.

23.  On September 14, 1993, the United States Patent and Trademark Office duly and legally issued United States Patent No. 5,244,030 ('030 Patent) for "Electrically Operated Folding Operable Walls."  GDRI owns all right, title and interest in and to the '030 Patent.

24.  On November 14, 1995, the United States Patent and Trademark Office issued Registration No. 1,935,394 for the mark, "THE SAFE PATH SYSTEM."  SPS owns all right, title and interest in and to this mark.

25.  At all times relevant herein, Plaintiffs possessed the exclusive authority, knowledge and expertise to ensure that each Safe Path System is manufactured, installed, serviced, repaired, and/or maintained properly.

26.  To that end, Plaintiffs developed and tested specific installation and maintenance guidelines and procedures to be performed on the Safe Path System, which are necessary to ensure that they are installed and operated properly, and to achieve the highest level of safety with respect to the use and operation of electrically operated partition doors.

27.  Plaintiffs' specific maintenance guidelines and procedures for the Safe Path System, which provide that, *inter alia*, the installation, service, repair and/or and maintenance

must be conducted by a SPS certified maintenance technician and/or contractor, and <u>that service must be performed at least once a year.</u> A copy of the Safe Path System's Manufacturer's Instruction ("<u>SPS Instruction</u>") is annexed hereto as Exhibit "2."

28. GDRI is the <u>only</u> entity certified by SPS to install, inspect, service, repair, and/or maintain the Safe Path Systems located in the City.

29. Plaintiffs further own the specific training materials for operation of the Safe Path System. Training is mandated by Regulation § 155.25, and is necessary and vital to ensure the safe and proper use and operation of the Safe Path System. Only Plaintiffs or their authorized contractors, technicians and/or vendors can perform the necessary training for the Safe Path System. In the City, Plaintiffs are the only entities authorized to perform training for the Safe Path System.

30. GDRI and SPS have not and do not demand fees that are excessive or unreasonable, given the costs associated with and the nature, size and scope of work to be performed on or relating to the Safe Path System.

## C. <u>NYCSCA Designated Safe Path System in Its Specifications</u>

31. NYCSCA is responsible for appropriating the funding (including, but not limited to, a portion of the $37.5 million in earmarked funds and other and additional funding) for the installation, service, repair, and/or maintenance of safety devices for each and every electrically operated partition door in the City.

32. One of NYCSCA's stated mission is to design and construct safe schools throughout the City. In addition, the NYCSCA has the power and duty to, *inter alia*, carry out the following functions:

(5) To design, construct, reconstruct, improve, rehabilitate, maintain, furnish, repair, equip and otherwise provide for educational facilities, as defined in section

twenty-five hundred ninety-a of the education law;

. . .

(7) To make and execute contracts and all other instruments necessary or convenient for the exercise of its functions, powers and duties . . . ."

See Public Authorities Law § 1728.

33.     In or around 2007, the NYCSCA issued the New York City School Construction Authority Manual (the "Specifications"). The Specifications set forth details and instructions regarding the design, construction, and maintenance of electrically operated partitions in the City. A relevant excerpt from the Specifications is annexed hereto as Exhibit "3."

34.     Section 4(a) of the Specifications, entitled, "Infra-red Safety Detection System," indicates the minimum criteria for the capabilities of the partition safety system and subsection (b) mandates the following:

The infra-red safety detection system shall be "Safe-Path" as manufactured by [GDRI], Huntington Station, NY – (631) 549-8745.

See Exhibit "3". (Emphasis added.)

**D.     Education Law § 409(f) and Regulation § 155.25(d)(4) Created Plaintiffs' Entitlement to Derive Revenue and Profit for Work and Services Related to the Safe Path System**

35.     As set forth above, Education Law § 409-f requires the installation of safety systems such as the Safe Path System for all electrically operated partition doors in all schools in the City.

36.     The Specifications designate the Safe Path System as the only safety system for use in all schools in the City. The Specifications exclusively designate GDRI as the manufacturer of the Safe Path System.

37.     Further, Regulation § 155.25(d)(4) mandates that the safety equipment installed in

connection with Education Law § 409-f be "maintained in accordance with the manufacturer's instructions, including the manufacturer's recommended service intervals."

38.    GDRI and SPS, as manufacturers of the Safe Path System, require that installation, inspection, service, repair and/or maintenance of the Safe Path System be performed only by certified maintenance technicians and/or contractors.

39.    Taken together, Education Law § 409-f, Regulation § 155.25 and the Specifications conveyed a property interest to Plaintiffs for all revenue and business opportunities generated from labor, materials and/or services that were required to be furnished in furtherance of compliance measures thereof, as follows:

a.    Plaintiffs have the exclusive right to manufacture the Safe Path System, which is required by Education Law § 409-f to be installed in every electrically operated partition doors in every school located in the City;

b.    The Specifications designate the Safe Path System as the only safety system to be installed in every school located in the City;

c.    The Specifications recognize GDRI as the manufacturer of the Safe Path System;

d.    Regulation § 155.25 conveys to SPS the exclusive authority to train and certify maintenance technicians and/or contractors to install, inspect, service, repair and/or maintain the Safe Path Systems; and

e.    Pursuant to Regulation § 155.25, Defendants are required to engage GDRI and SPS to install, inspect, service, repair and/or maintain Safe Path Systems.

40.    Plaintiffs have been *de facto* de-barred as they were deprived of any opportunity to furnish labor, materials and services in connection with school construction work in the City without due process.

E.    **Defendants' Failure to Enforce Education Law § 409-f and Regulation § 155.25 Deprived Plaintiffs of Their Property Rights**

41.    Upon information and belief, there are more than one thousand (1,000) schools in

the City with more than one thousand (1,000) electrically operated partitions.

42.     Since in or around 2003, only approximately five hundred (500) Safe Path Systems have been installed in schools in the City.

43.     Upon information and belief, Safe Path Systems have not been installed in more than five hundred (500) locations that require the installation of Safe Path Systems despite Education Law § 409-f, requiring such installation.

44.     Upon information and belief, Safe Path Systems installed in schools throughout the City have not been regularly inspected, serviced, repaired and/or maintained in accordance with Education Law § 409-f and Regulation § 155.25.

45.     Upon information and belief, to the extent Safe Path Systems are inspected, serviced, repaired and/or maintained, such work was performed by non-SPS certified technicians and/or contractors.

46.     Upon information and belief, the technicians, contractors, and/or school personnel, being hired by Defendants to inspect, service, repair and/or maintain Safe Path Systems, have not been trained or certified by SPS.

47.     Defendants have willfully and knowingly failed or refused to enforce or comply with Education Law § 409-f and Regulation § 155.25.

48.     Defendants have further wrongfully deprived Plaintiffs' property interests without affording Plaintiffs due process of law.

49.     Defendant Walcott deprived Plaintiffs of their property interests without due process of law by failing or refusing to enforce Education Law § 409-f and Regulation § 155.25.

50.     Defendant Shea deprived Plaintiffs' property interests without due process of law by rejecting Plaintiffs' efforts to gain the City's compliance with and enforcement of Education

Law § 409-f and Regulation § 155.25. Specifically, from on or about 2008 to date, Defendant Shea failed or refused to acknowledge the City's requirement to comply with Education Law § 409-f and Regulation § 155.25, notwithstanding repeated urgings by Plaintiffs.

51. Defendant Braren deprived Plaintiffs of their property interests without due process of law by obstructing Plaintiffs' efforts to gain the City's compliance with and enforcement of Education Law § 409-f and Regulation § 155.25. Specifically, since in or about 2005 when Defendant Braren advised Plaintiffs that the City would not comply with the maintenance requirements under Education Law § 409-f and Regulation § 155.25, and to date, Defendant Braren repeatedly rejected Plaintiffs' demand that the City enforce Education Law § 409-f and Regulation § 155.25.

52. Individual Defendants Coyle, D'Alimonte and Fanizzi deprived Plaintiffs of their property interests without due process of law by obstructing Plaintiffs' efforts to gain the City's compliance with and enforcement of Education Law § 409-f and Regulation § 155.25. Specifically, upon information and belief, said individual defendants refused to enforce Education Law § 409-f and Regulation § 155.25, despite having acknowledged that the City was not in compliance with said law and regulation.

53. Upon further information and belief, said Individual Defendants further instructed several general contractors engaged by the City to pull Plaintiffs from all of the pre-existing purchase orders relating to the installation, service, repair and/or maintenance of the Safe Path System, and to not pay Plaintiffs any money they were owed for labor and materials furnished in connection with the Safe Path Systems.

54. On repeated occasions, since 2007, Plaintiffs made demands on Defendants to enforce and comply with Education Law § 409-f and Regulation § 155.25. Specifically,

Plaintiffs informed Defendants, including the Individual Defendants, of the following:

    a. Defendants have failed to comply with Education Law § 409-f and Regulation § 155.25;

    b. Defendants' failure or refusal to comply with Education Law § 409-f and Regulation § 155.25 has created, and is continuing to create, an unreasonable risk of death or serious bodily injury to the children and/or any individuals that come into proximity with the electrically operated partitions located in schools in the City; and

    c. Plaintiffs were and are ready, willing, and able to perform such installation, service, repair, and/or maintenance of the Safe Path System as is required of Defendants in order to comply with Education Law § 409-f and Regulation § 155.25.

55. Since beginning 2004 and continuing thereafter, Plaintiffs have repeatedly advised Defendants concerning Plaintiffs' rights as owners of the intellectual property of the Safe Path System. Further, in or around March 2011, Plaintiffs sent NYCDOE a letter again advising that GDRI is the only SPS certified contractor to provide the installation, inspection, service, repair, and/or maintenance of the Safe Path Systems. Plaintiffs further reminded Defendants about SPS's ownership of the trademark and other intellectual properties of the Safe Path System, including, but not limited to, its training materials, trademark, name and logo.

56. Despite having received Plaintiffs' March 2011 letter, Defendants have continued to wrongfully hire and employ non-SPS certified contractors or technicians for inspection, service, repair, and/or maintenance of the installed Safe Path Systems.

57. Further, Defendants have continued to wrongfully use non-SPS certified contractors to perform training for the use and operation of the Safe Path System.

58. Defendants' use of non-SPS certified contractors or technicians to perform service, repair and/or maintenance of the Safe Path System as well as training for the use and operation of the installed Safe Path Systems has infringed and induced the infringement of,

Plaintiffs' patent, trademark and other intellectual property rights related to the Safe Path System.

59.     Defendants' use of non-SPS certified contractors, as aforesaid, constitutes an unlawful infringement of GDRI's patent related to the Safe Path System under 35 U.S.C. § 271.

60.     Defendants' use of non-SPS certified contractors, as aforesaid, has unlawfully induced the infringement of SPS's rights as registrant owner of the trademark of Safe Path Systems under 15 U.S.C. § 1114 and New York General Business Law § 360-k.

61.     Defendants further sought to deprive Plaintiffs of their property interests by, in effect debarring them from installation or maintenance of Safe Path Systems without any pre or post-deprivation hearing or due process of law, as follows:

    a.  refusing to install Safe Path System on electrically operated doors not yet equipped with the required safety device despite the government law and regulation;

    b.  refusing to hire Plaintiffs to perform the required inspection, service, repair and/or maintenance of the installed Safe Path Systems despite the government law and regulation;

    c.  engaging non-SPS certified technicians and contractors to perform inspection, service, repair and/or maintenance work of the Safe Path System despite the government law and regulation;

    d.  refusing to hire Plaintiffs to train and certify individuals in accordance with the SPS Instruction despite the government law and regulation;

    e.  holding unauthorized training classes, with no GDRI and/or SPS employees or agents present, and "training" non-SPS certified technicians, contractors, and/or school personnel to unlawfully and improperly bypass the Safe Path Systems despite the government law and regulation; and

    f.  engaging non-SPS certified technicians and contractors to perform inspection, service, repair and/or maintenance work of the Safe Path System as well as training on the use and operation of the Safe Path System, which results in wrongful and unlawful infringement of Plaintiffs' rights as the owners and registrants of the patent, trademark

and other intellectual properties related to the Safe Path System.

62.     Since 2003, Plaintiffs have met in person with at least 15 of Defendants' employees and/or agents, including the Individual Defendants, and have alerted Defendants of their failure and refusal to comply with Education Law § 409-f and Regulation § 155.25.58.

63.     Plaintiffs have further sought redress from the New York City Department of Investigations and the New York State Attorney General's Office.

64.     No redress was forthcoming from either office.

65.     Having exhausted their administrative efforts to gain enforcement of Education Law § 409-f and Regulation § 155.25 by Defendants, in or about March 2011, pursuant to Article 78 of the New York Civil Practice Law and Rules, Plaintiffs commenced a lawsuit entitled, *Gym Door Repairs, Inc., et al. v. New York City Department of Education, et al.* (Supreme Court, Albany County Index No. 4005/2011) (the "Article 78 Action"), to compel Defendant NYCDOE and non-parties, New York State Education Department, Kathleen Black and David M. Steiner, to enforce Education Law § 409-f and Regulation § 155.25. However, the State Supreme Court ultimately ruled that Plaintiffs lacked standing to bring the Article 78 Action.

66.     In retaliation against Plaintiffs for shedding light on Defendants' willful failure or refusal to comply with Education Law § 409-f and Regulation § 155.25, and their efforts to gain Defendants' compliance therewith (including bringing the Article 78 Action), and in further violation of Education Law § 409-f and Regulation § 155.25, the Individual Defendants directed contractors engaged to perform school construction and improvement work by Defendants NYCDOE and NYCSCA to "never use" GDRI or SPS on any NYCDOE or NYCSCA projects. Defendants' decision to "never use" Plaintiffs' services amounts to a *de facto* debarment of

Plaintiffs without any pre or post deprivation hearing or other form of procedural due process.

67.     In further retaliation against Plaintiffs for shedding light on Defendants' willful failure or refusal to comply with Education Law § 409-f and Regulation § 155.25 and their efforts to gain Defendants' compliance therewith (including bringing the Article 78 Action), Defendants removed (or caused the removal of) the Safe Path System from the specifications of NYCSCA in or about April 2012.

68.     Plaintiffs were exercising their rights to free speech, association and assembly under the First and Fourteenth Amendment to the United States Constitution by their efforts to gain Defendants' compliance with Education Law § 409-f and Regulation § 155.25, to wit, demanding Defendants' cooperation and enforcement of Education Law § 409-f and Regulation § 155.25 and seeking administrative review and judicial intervention to enjoin Defendants' compliance and enforcement failures.

69.     Defendant retaliatory actions towards Plaintiffs as described above constitute a violation of Plaintiffs' rights to free speech, association and assembly protected by the First and Fourteenth Amendments to the United States Constitution.

70.     Defendants are aware of their failure to enforce and comply with Education Law § 409-f and Regulation § 155.25.

71.     Defendants continued to fail and refuse to enforce and comply with Education Law § 409-f and Regulation § 155.25 to circumvent and deprive Plaintiffs of their Property Interests, despite Plaintiffs repeated complaints to the NYCDOE.

72.     As a result of Defendants' failure to comply with Education Law § 409-f and Regulation § 155.25, and their retaliation against Plaintiffs, Defendants have willfully and unlawfully deprived Plaintiffs of their Property Interests.

73.     Defendants' willful failure or refusal to comply with Education Law § 409-f and Regulation § 155.25 was arbitrary and capricious, and amounts to an improper and unlawful taking of Plaintiffs' Property Interests.

74.     Defendants' refusal or failure to cooperate in Plaintiffs' demand that Defendants enforce and comply with Education Law § 409-f and Regulation § 155.25, and their continuing retaliatory conduct against Plaintiffs and *de facto* debarment of Plaintiffs constitute a complete and wrongful failure to afford Plaintiffs their procedural and/or substantive due process rights.

75.     As set forth above, Plaintiffs possess a property interest in the business opportunities and revenue derived from Defendants' enforcement and compliance with Education Law § 409-f and Regulation § 155.25.

76.     Defendants' failure or refusal to enforce or comply with Education Law § 409-f and Regulation § 155.25 constitutes an unlawful taking of Plaintiffs' property interests.

77.     Defendants' failure or refusal to comply with Education Law § 409-f and Regulation § 155.25 has deprived, and is continuing to deprive, Plaintiffs of their property interests.

78.     Defendants enjoy no qualified immunity for the violation of Plaintiffs' rights as alleged herein.

## AS AND FOR A FIRST CAUSE OF ACTION
### *Violation of 42 U.S.C. § 1983*

79.     Plaintiffs repeat and reallege each and every allegation contained in paragraphs 1 through 78 as if fully set forth herein.

80.     As a result of Defendants' willful failure to comply with Education Law § 409-f and Regulation § 155.25, their retaliation against Plaintiffs, their *de facto* debarment of Plaintiffs, and their removal of the Safe Path System from the NYCSCA Specifications, Plaintiffs' rights to

substantive and procedural due process have been violated and they have been significantly damaged thereby.

81.     As a result of Defendants' willful failure to comply with Education Law § 409-f and Regulation § 155.25, their retaliation against Plaintiffs, their *de facto* debarment of Plaintiffs, and their removal of the Safe Path System from the NYCSCA Specifications, Plaintiffs' rights to substantive due process have been violated and they have been significantly damaged thereby.

82.     The NYCDOE, NYCSCA, the City, and the Individual Defendants in their official capacities, have violated Plaintiffs' rights to procedural and substantive due process. Their official practice, custom, and/or policy have led to a rampant failure or refusal to comply with Education Law § 409-f and Regulation § 155.25, and their retaliatory conduct towards Plaintiffs have effectively prevented SPS and GDRI from being hired to furnish labor, material and services required by said statute and regulation.

83.     Individual Defendants Walcott, Shea, Grillo, Braren Coyle, D'Alimonte, Fanizzi, John Does 1-10, the NYCSCA Board of Trustees and their employees and/or agents had personal involvement in the willful and deliberate violations of Plaintiffs' rights to procedural and substantive due process.

84.     As a result of the foregoing, Plaintiffs have been damaged in an amount to be determined at trial.

## AS AND FOR A SECOND CAUSE OF ACTION
### *Violation of Plaintiffs' First Amendment Rights*

85.     Plaintiffs repeat and reallege each and every allegation contained in paragraphs 1 through 84 as if fully set forth herein.

86.     By retaliating against Plaintiffs for disclosing and complaining to the New York City Department of Investigations, Office of New York State Attorney General and other public

officials concerning Defendants' willful failure to comply with Education Law § 409-f and Regulation § 155.25, Defendants violated Plaintiffs' rights to free speech, assembly and association protected by the First Amendment to the United States Constitution, as made actionable against them pursuant to 42 U.S.C. § 1983.

87.     By retaliating against Plaintiffs for bringing the Article 78 Action to compel Defendants' compliance with Education Law § 409-f and Regulation § 155.25, Defendants violated Plaintiffs' rights to free speech, assembly and association protected by the First and Fourteenth Amendments to the United States Constitution, as made actionable against them pursuant to 42 U.S.C. § 1983.

88.     Individual Defendants Walcott, Shea, Grillo, Braren Coyle, D'Alimonte, Fanizzi, John Does 1-10, the NYCSCA Board of Trustees and their employees and/or agents had personal involvement in the willful and deliberate violations of Plaintiffs' rights to free speech, assembly and association protected by the First and Fourteenth Amendments to the United States Constitution, as made actionable against them pursuant to 42 U.S.C. § 1983.

89.     As a result of Defendants willful failure to comply with Education Law § 409-f and Regulation § 155.25, and their retaliation against Plaintiffs for their exercise of the rights to free speech, assembly and association protected by the First and Fourteenth Amendments to the United States Constitution, Plaintiffs suffered, and will continue to suffer, extreme, serious and irreparable damage, including, but not limited to, lost business opportunities and revenue, and deprivation and infringement of Plaintiffs' rights as the owners and registrants of the intellectual properties related to the Safe Path System.

90.     Plaintiffs are entitled to compensatory and other allowable damages in an amount to the determined at trial, for the wrongful and unlawful acts of retaliation by Defendants against

Plaintiffs for the exercise of their rights of free speech, assembly and association protected by the First and Fourteenth Amendments to the United States Constitution. As a result of the foregoing, Plaintiffs have been damaged in an amount to be determined at trial.

**AS AND FOR A THIRD CAUSE OF ACTION**
*Prohibitory Injunction*

91.    Plaintiffs repeat and reallege each and every allegation contained in paragraphs 1 through 90 if fully set forth herein.

92.    The NYCDOE, NYCSCA, the City, and the Individual Defendants in their official capacities, have violated Plaintiffs' rights to procedural and substantive due process. Their official practice, custom, and/or policy have led to a rampant failure or refusal to comply with Education Law § 409-f and Regulation § 155.25, and their retaliatory actions towards Plaintiffs have effectively prevented them from being hired to furnish labor, material and services required by said law and regulation.

93.    Defendants are continuing to violate and deprive Plaintiffs' rights to procedural and substantive due process by their continuing and rampant failure or refusal to comply with Education Law § 409-f and Regulation § 155.25, and their retaliatory actions towards Plaintiffs that is continuing to prevent Plaintiffs from being hired to furnish labor, material and services required by said law and regulation.

94.    By retaliating against Plaintiffs for disclosing and complaining to the New York City Department of Investigations, Office of New York State Attorney General and other public officials concerning Defendants' willful failure to comply with Education Law § 409-f and Regulation § 155.25, Defendants violated Plaintiffs' rights of free speech, association and assembly protected by the First and Fourteenth Amendments to the United States Constitution, as made actionable against them pursuant to 42 U.S.C. § 1983.

95.     By retaliating against Plaintiffs for bringing the Article 78 Action to compel Defendants' compliance with Education Law § 409-f and Regulation § 155.25, Defendants violated Plaintiffs' rights of free speech, association and assembly protected by the First and Fourteenth Amendments to the United States Constitution, as made actionable against them pursuant to 42 U.S.C. § 1983.

96.     As a result of Defendants' willful failure to comply with Education Law § 409-f and Regulation § 155.25, and their retaliation against Plaintiffs for their exercise of the rights of free speech, association and assembly protected by the First and Fourteenth Amendments to the United States Constitution, Plaintiffs suffered, and will continue to suffer, extreme, serious and irreparable damage, including, but not limited to, lost business opportunities and revenue and deprivation and infringement of Plaintiffs' rights as the owners and registrants of the intellectual properties related to the Safe Path System.  Plaintiffs are entitled to a permanent injunction prohibiting and enjoining Defendants and those acting in concert with them, their agents and successors from engaging in further retaliatory actions against Plaintiffs, to wit:  (i) refusing to install Safe Path System on electrically operated doors not yet equipped with the required safety device despite the government law and regulation; (ii) refusing to hire Plaintiffs to perform the required inspection, service, repair and/or maintenance of the installed Safe Path Systems despite the government law and regulation; (iii) engaging non-SPS certified technicians and contractors to perform inspection, service, repair and/or maintenance work of the Safe Path System despite the government's law and regulation;  (iv)  refusing to hire Plaintiffs to train and certify individuals in accordance with the SPS Instruction despite the government law and regulation; (v) holding unauthorized training classes, with no GDRI and/or SPS employees or agents present, and "training" non-SPS certified technicians, contractors, and/or school personnel to

unlawfully and improperly bypass the Safe Path Systems despite the government law and regulation; (vi) engaging non-SPS certified technicians and contractors to perform inspection, service, repair and/or maintenance work of the Safe Path System as well as training on the use and operation of the Safe Path System, which results in wrongful and unlawful infringement of Plaintiffs' rights as the owners and registrants of the patent, trademark and other intellectual properties related to the Safe Path System; (vii) directing, demanding or otherwise causing contractors engaged to perform school construction and improvement work by Defendants NYCDOE and NYCSCA to "never use" GDRI or SPS on any NYCDOE or NYCSCA projects; (viii) instructing general contractors engaged by the City to pull Plaintiffs from all of the pre-existing purchase orders relating to the installation, service, repair and/or maintenance of the Safe Path System; (ix) instructing or causing general contractors engaged in school construction projects to not pay Plaintiffs for or withhold money Plaintiffs were owed for labor and materials furnished in connection with the Safe Path Systems; and (x) replacing the installed Safe Path Systems in the schools of the City with other systems.

### AS AND FOR A FOURTH CAUSE OF ACTION
*Mandatory Injunction*

97.     Plaintiffs repeat and reallege each and every allegation contained in paragraphs 1 through 96 as if fully set forth herein.

98.     The NYCDOE, NYCSCA, the City, and the Individual Defendants in their official capacities, have violated Plaintiffs' rights to procedural and substantive due process. Their official practice, custom, and/or policy have led to a rampant failure or refusal to comply with Education Law § 409-f and Regulation § 155.25, and their retaliatory conduct towards Plaintiffs have effectively prevented them from being hired to furnish labor, material and services required by said law and regulation.

99.     Defendants are continuing to violate and deprive Plaintiffs' rights to procedural and substantive due process by their continuing and rampant failure or refusal to comply with Education Law § 409-f and Regulation § 155.25, and their retaliatory actions towards Plaintiffs that is continuing to prevent Plaintiffs from being hired to furnish labor, material and services required by said law and regulation.

100.    By retaliating against Plaintiffs for disclosing and complaining to the New York City Department of Investigations, Office of New York State Attorney General and other public officials concerning Defendants' willful failure to comply with Education Law § 409-f and Regulation § 155.25, Defendants violated Plaintiffs' rights of free speech, association and assembly under the First and Fourteenth Amendments to the United States Constitution, as made actionable against them pursuant to 42 U.S.C. § 1983.

101.    By retaliating against Plaintiffs for bringing the Article 78 Action to compel Defendants' compliance with Education Law § 409-f and Regulation § 155.25, Defendants violated Plaintiffs' rights of free speech, association and assembly protected by the First and Fourteenth Amendments to the United States Constitution, as made actionable against them pursuant to 42 U.S.C. § 1983.

102.    As a result of Defendants' willful failure to comply with Education Law § 409-f and Regulation § 155.25, and their retaliation against Plaintiffs for their exercise of the rights of free speech, association and assembly protected by the First and Fourteenth Amendments to the United States Constitution, Plaintiffs suffered, and will continue to suffer, extreme, serious and irreparable damage, including, but not limited to, lost business opportunities and revenue, and deprivation and infringement of Plaintiffs' rights as the owners and registrants of the intellectual properties related to the Safe Path System.

103.    Plaintiffs are entitled to an order prohibiting and enjoining Defendants and those acting in concert with them, their agents and successors, from engaging in further violations of Plaintiffs' substantive and procedural due process rights and retaliatory actions against Plaintiffs, and requiring Defendants to:  (i) enforce and comply with Education Law § 409-f and Regulation § 155.25; (ii) require installation of Safe Path System on electrically operated partition doors not yet equipped with the required safety device; (iii) reinstate the Safe Path System in the Specifications of the NYCSCA; (iv) engage Plaintiffs and other SPS certified technicians or contractors to perform the required inspection, service, repair and/or maintenance of the installed Safe Path Systems; (v) require only SPS certified technicians and contractors (including GDR) to perform inspection, service, repair and/or maintenance work of the Safe Path System; and (vi) hire Plaintiffs and other SPS certified instructors to train and certify individuals in accordance with the SPS Instruction to perform the required inspection, service, repair and/or maintenance of the installed Safe Path Systems.

WHEREFORE, Plaintiffs demand judgment against Defendants, jointly and severally, as follows:

(a) As and for their First Cause of Action, pursuant to 42 U.S.C. § 1983, in an amount to be determined at trial, including interest thereon, for the damages sustained by Plaintiffs as a result of the violations of Plaintiffs rights as set forth herein;

(b) As and for their Second Cause of Action, pursuant to 42 U.S.C. § 1983, awarding compensatory and other allowable damages, including interest thereon, for violations of Plaintiffs rights as set forth herein;

(c) As and for their Third Cause of Action, pursuant to 42 U.S.C. § 1983, permanently prohibiting and enjoining Defendants from:

    i.      engaging non-SPS certified contractors or technicians to perform inspection, service, repair and/or maintenance of the Safe Path System;

    ii.     hiring non-SPS certified contractors or technicians to perform training for the use and operation of the installed Safe Path Systems;

    iii.   requiring contractors engaged by Defendants to perform school construction and improvement work to refrain from using GDRI or SPS on any of Defendants' projects;

    iv.   demanding or otherwise causing contractors engaged by Defendants to perform school construction and improvement work to refrain from paying or withholding payments from GDRI or SPS for labor and materials furnished by Plaintiffs; and

    v.     engaging in such other and further acts and conducts in retaliation against Plaintiffs for the exercise of their rights of free speech, association and assembly protected by the First Amendment to the United States Constitution.

(d) As and for their Fourth Cause of Action, pursuant to 42 U.S.C. § 1983, issuing a permanent and mandatory injunction enjoining Defendants from engaging in further violations of Plaintiffs' substantive and procedural due process rights and retaliatory actions against Plaintiffs, and requiring Defendants to:

    i.      enforce and comply with Education Law § 409-f and Regulation § 155.25;

    ii.     install Safe Path Systems on electrically operated partition doors not yet equipped with the required safety device;

    iii.   reinstate the Safe Path System in the Specifications of NYCSCA;

    iv.   hire Plaintiffs and other SPS certified technicians or contractors to perform the required inspection, service, repair and/or maintenance of the installed Safe Path Systems;

    v.     require only SPS certified technicians and contractors (including GDRI) to perform inspection, service, repair

and/or maintenance work of the Safe Path System; and

vi.   hire Plaintiffs and other SPS certified instructors to train and certify individuals in accordance with the SPS Instruction to perform the required inspection, service, repair and/or maintenance of the installed Safe Path Systems.

(e) attorneys' fees pursuant to 42 U.S.C. § 1988, and the costs and disbursements associated with this action; and

(f) for such other and further relief as the Court may deem just and proper.

Dated: New York, New York
       October 1, 2012

**TARTER KRINSKY & DROGIN LLP**
*Attorneys for Plaintiffs*

By: _____

Eric Su (ES0626)
Richard Steer (RS0300)
1350 Broadway, 11th Floor
New York, NY 10018
(212) 216-8000
(212) 216-8001
esu@tarterkrinsky.com
rsteer@tarterkrinsky.com

# EXHIBIT 1



## PERFORMANCE SPECIFICATION

# SAFETY DEVICES FOR ELECTRICALLY OPERATED PARTITIONS AND DIVIDER CURTAINS

## PART I GENERAL

### 1.01 INTENT

It is the intent of this specification for the Contractor to incorporate a complete life safety detection system, as the **Safe Path System™**, or approved equal. All components shall be designed and manufactured for use on all existing electrically operated folding/ operable partitions. The safety system shall be marketed and obtained as a fully tested system for this purpose.

Hardware assembled from various sources to serve the installation needs is specifically unacceptable.

Safety detection system shall create an infrared barrier at each side of the entire operation path so that immediate shut down will occur if any personnel obstruction enters into the operating path. When an obstruction is detected, the movement of the door shall instantly and automatically stop regardless of the direction the door is traveling and an alarm shall sound. For continued operation of the folding door. system must be manually re-armed by provided key switch. Upon completion, the safety system shall comply with the New York State Education Equipment requirements and regulations 155.25 set by the Commissioner

### 1.02 SECTION INCLUDES

    A.     Installation of safety system and second key switches.
    B.     Associated electrical requirements

### 1.03 REFERENCES

    A.     NYSED Law 409-F/Commissioner's Regulation 155.25
    B.     AIA-CES/American Institute of Architects-Continuing Education Services.
    C.     NYC-Department of Education/NYC-School Construction Authority
    D.     NYS Fire Marshalls and Inspector Association
    E.     NYS Superintendent of Buildings and Grounds Association
    F.     ASTM E 557- Standard Practice for Architectural Application and Installation of Operable Partitions.

1.04 SUBMITTALS

    A.   See Administrative Requirements, for submittal procedures.

    B.   Samples for Selection: Provide to school a sample of intended safety system in advance of bid opening.

    C.   Manufactuer's Instructions: Indicate special procedures, perimeter conditions require special attention, and installation sequence.

    D.   Maintenance Date: Include recommended cleaning methods, cleaning materials. Describe cleaning materials which should not be used.

1.05 QUALITY ASSURANCE

    A.   The operable wall safety system specified shall be furnished and installed by an authorized local distributor licensed by a life safety detection system for electrically operated partitions manufacturer and affiliations with operable wall manufacturer's with the mechanics of an operable partition system. Local distribution is required to insure prompt project coordination and future customer service.

    B.   Manufacturer Qualifications: Company specializing in manufacturing of said safety system in conjunction with the manufacturing of operable partitions for a minimum five (5) years of documented experience.

    C.   Provider must have a minimum of twenty (20) like safety systems previously installed and record of prior approval from State Education Department.

    D.   Distributor Qualifications: Company specializing in sales service, maintenance, repairs and installation of safety detection systems in conjunction with operable partitions shall be incorporated under that name for a minimum of five (5) years.

1.06 WARRANTY

    A.   Warranty: Installation of new materials, hardware and safety sensors shall be guaranteed for a period of no less than one (1) year against defects in materials and workmanship.

1.07 PROJECT CONDITIONS

    A.   Coordinate the work with other sections and around any school related Activities.

## PART 2 WORK INCLUDED:

The contractor shall provide all the necessary materials and labor to facilitate, erect, construct, install and finish the work as outlined in the specifications.

## 2.01 SPECIFICATIONS

1.  The successful vendor agrees to furnish and install sufficient infrared sensing devices, with the approved guards, to detect any personnel obstructions along the entire length of the path of the folding door (no more than seven (7) feet, no less than three (3) feet to both sides) during opening and closing modes.

    A.  Passive Infrared Detectors "OPTEX" model # SP-80 AM High Sensitivity (PIR) Device shall be capable of wall or ceiling surface mounting, self-contained, self-monitoring circuit operating on 12 VDC input power and have adjustable integra anti-masking features capable of automatic fail to safe condition function optics. Optics shall be focused to provide the narrowest detection corridor adjacent to the doors that assures reliable detection. The operator control switches shall be positioned as close to the detection corridor as possible without causing the operator to cause an unintended detection/alarm. Each Long-Range PIR Detector shall provide a **multiple individual zones of** detection. A solid infrared barrier must be achieved and be free of voids between detection zones. PIR detectors which permit voids in the infrared barrier and do not provide 100% coverage are unacceptable.

    B.  PIR guards shall be constructed of sheet metal with hi-temperature baked white enamel finish or an approved equal. Guard shall be independently fastened to the wall or ceiling with a least four approved fastening devices.

    C.  The infrared safety system must be designed to work as an integral part of the operable partition system. While the partition is in operation a **minimum of two (2) infrared sensors** monitor **each side** of the partition for movement and immediately disengages the motor upon the "safety zone" being interrupted. These infrared beams must span the entire path of the partition on both sides. a **minimum of four (4) sensors** being used. Long range sensors shall be wall mounted 9-12 feet from floor (higher on wall or ceiling mount per site condition) and each PIR shall be covered by a sheet metal protective housing. The protective housing must be sheet metal so as to minimize dust collecting on the lens. Custom manufactured covers trapezoidal prevent items from resting or hanging on the cover causing blockage. Open cage style covers are not acceptable.
    An additional two (2) pocket/stack sensors "OPTEX" model #SP-40SS (PIR) shall be capable of wall or ceiling mounting self-contained self monitoring circuit. anti-masking technology. operating on 12 VDC input power,

must be mounted at the entrance of pocketed areas and or behind stacked panels. These sensors will detect intrusion into these critical areas at any point during the operation cycle, (whether the partition is at rest or in motion) and render the operable partition inoperable until keyed reset switches mounted (1) **on each side** of the stacked panels are engaged. Additional sensors will be installed as site conditions warrant. Each concealed stack area PIR Detector shall provide a **multiple of** individual zones of detection.

D.  In the interest of partition maintenance and the greater potential for equipment damage the school has determined that weight sensitive floor mats in the pocket or stack area is not acceptable.

E.  Photo-electric, point to point sensors mounted below 8' AFF will not be acceptable.

F.  Provide and install required signage for safe operating procedures.

> · WARNING-
> · Electrically powered partition
> · Only appropriately trained staff may operate this partition.
> · Control stations must be attended by staff members while the partition is in motion
> · Staff members must stand on opposite sides of partition during stacking and extending procedure
> · Students must stay away from partition while in motion.

2.02  The successful vendor agrees to install a lockable system control panel (SCP) of suitable size to house the following equipment:

A.  Terminal strip of sufficient size, for each connection into panel.
B.  Complete circuit control board.
C.  Two (2) 12 VDC relay devices.
D.  Resistors, resistor blocks interwiring.
E.  Power supply capable of additional components of various types.
F.  Alternate voltage switching device.
G.  Suitable barrier for voltage separation.
H.  SCP shall be located adjacent to existing electrical controls and for assurance of qualified individual and documentation of equipment drive system area
I.  Include code security tag, sealing enclosure.

2.04   Vendor agrees to furnish and install, in gym ceiling or door storage pocket area at ceiling level, an alarm-warning device to be activated for fifteen (15) seconds when system sensed any obstruction and stops the movement of door.  Warning alarm device shall be Sound Bomb Type PIEZO warning device alert with 100 decibels output, with high and low settings or an approved equal.  This device is integral to the system control panel.

2.05   A.   Vendor agrees to furnish and install all interwiring of suitable size, and raceways from the nearest electrical.  Make the proper connections to all items.  Minimum size raceway from low voltage conductors shall be ½ inch.  Minimum size raceway for power shall be ¾ inch.

B.   Existing conduits may be used where allowed by code. Flexible conduits may be used in concealed locations.  Metal moldings shall be utilized in offices.

C.   All power wiring shall be THHN, minimum size #12.  Low voltage wiring shall be 22 gauge, twisted, unshielded, copper, vinyl insulated, UL listed.  Low voltage conductors shall not be placed in the same raceway, outlet box junction box or fitting containing electrical power, unless a suitable barrier is provided.

D.   All equipment shall be installed in a fail-safe manner such that the failure of any safety device shall render the electrically operated partition inoperable until such device is repaired.

## PART 4 COMPLETION

4.01   Upon Completion, successful vendor shall arrange for a demonstration of the system to be witnessed by the appropriate school officien/s, Custodian, Principal and Superintendent of Buildings and Grounds.

4.02   Vendor will furnish the Superintendent of Building and Grounds with:
· (2) sets of keys for the entire system and a set of operating instructions/owners manual
· NYSED law 409-F and commissioners regulations 155.25.
· Staff Training Materials.

4.03   All work shall be performed in accordance with the latest edition of the National Electrical code and applicable local codes.

4.04   Vendor will furnish the Superintendent of Building and Grounds with 3 copies of manuals containing manufacturer's instructions, operating and maintenance data and warranty for all equipment installed on this project.

4.05   All equipment and parts shall be warranted by the vendor to be free from defects in materials and workmanship for an extended period of one (1) year from the date of installation completion.

**END OF SECTION**



Gym Door Repairs, Inc. 685 E. Jericho Tpke. Huntington Station, NY 11746

## MANUFACTURER'S INSTRUCTIONS

The purpose of this document is to help ensure the proper installation, maintenance and repair procedures for the correct function of this Life Safety Detection Equipment. Established standards pursuant to education law section 409-f, relating to the construction, maintenance and operation of electrically operated partitions located in classrooms or other facilities used by students in public and non-public schools or educational institutions within the state relate directly to our specific Safe Path patented and trade marked safety detection system requirements.

The patented design is recognized throughout the United States and Canada. Since 1991, our extensive efforts working closely with the New York State Education Department set the standard for these equipment requirements.

Together we have also developed a Staff Training Procedure which satisfies Commissioner's Regulation 155.25. New York State is the only state in the nation requiring safety devices for electrically operated partitions and dividers. The Safe Path™ life safety detection system has been installed in many locations across America and these manufacturer's instructions are consistent and apply to all states and are not limited to New York State.

Our ongoing commitment to provide qualified individuals with the knowledge and training required to perform any procedures is imperative to the safety of school children as they are required to assemble in areas and forced to be in close proximity to dangerous equipment every day.

Manufacturer's responsibility and moral obligation demand the proper performance of each and every system continually. The correct function of individual components and precise communication between them is critical.

Only Certified Technicians employed by a Licensed and Authorized Dealer may perform any procedures relating to the Safe Path™ life safety detection system. The Manufacturer's suggested service interval is at least annually.

These manufacturer's instructions precede and refer to qualifications, training, certified technicians, licensing and authorization, physical maintenance procedures, staff training procedures, education department regulations and satisfactory documentation of mandatory requirements.

*Revised 2009 © U.S. Patent #5,244,030  Canadian Patent #2,101,376*

# EXHIBIT 2



## MANUFACTURERS MAINTENANCE PROCEDURE

PHYSICAL MAINTENANCE REQUIREMENTS

1. Perform a visual inspection of <u>all</u> individual components for damage, improper application or incorrect location.
2. Clean the exterior of each PIR lens with soap and water or a damp cloth – dry completely. Re-secure all protective metal covers to correct torque and align for clear and proper projection of PIR detection zones.
3. Check torque of securing assembly at arming key switch and re-secure as required.
4. Inspect posted signage at each key control station for correct positioning and compliance with NYSED regulations – securing as required.
5. Check LED's at key stations for proper illumination and function.
6. Inspect wiring connections – retorquing terminals as required.
7. Check all wiring, conduits and connections for compliance with the latest edition of the National Electric Code and local codes which have jurisdiction.
8. Remove the existing security seal on the system control panel and access – inspect for correct wiring hook-ups in accordance with manufacturers instruction. Check all terminals for secure connection – resecuring to proper torque as required. Test for proper operating voltage at upper and lower areas of enclosure. Inspect for isolated voltages – line voltage at lower portion of the enclosure/low voltage at upper portion of the enclosure.
9. Perform AMP test on the power output terminals within the system control panel, checking for excessive power draw from system components. Unacceptable reading shall prompt further inspection of individual components for correct function. Calculation of all system components is necessary for determining acceptable power draw as site conditions and the number of components may vary.
10. Provide new security seal/ # on system control panel.
11. Test anti-masking function of all PIR sensors which incorporate this feature.

TESTING OF THE SAFE PATH SYSTEM

1. Try to operate the partition without arming the Safe Path system. The partition should not be operable.

2. Arm the Safe Path System.
   a. Operator #1 turns and holds the slave key in either "on" position.
   b. The green LED on the master key will go on.
   c. Operator #2 arms the Safe Path System. The red and green LED on the master key will go on.
   d. Operate the partition.
   e. During operation, Operator #1 must release the slave key. The partition must stop and the alarm must sound.
   f. Operator #2 disarms the Safe Path System. Alarm must turn off.

3.
   a. Have two operators arm the Safe Path System and operate the partition.
   b. Have a third person cross the PIR sensors detection zones.
   c. The partition must stop and the alarm must sound.
   d. Disarm the Safe Path System.

4.
   a. Have one operator turn the slave key and hold in the "on" position. The green LED at the master station will go on.
   b. A second person must cross PIR sensors detection zones.
   c. The green LED must go off.
   d. A second person must stand clear of PIR zones and wait for PIR's to reset. The green LED at the master station will go on.
   e. A second person must cross PIR sensors detection zones at different locations.
   f. The green LED must go off whenever the PIR sensors detection zones are crossed.
   g. Walk test the entire span on both sides of the partition.

5. Pocket intrusion – if installed in pocket or between bleachers.
   a. Reset pocket intrusion – requires two operators to turn both reset switches at the same time.
   b. Walk into the pocket area. The intrusion should activate indicated by a flashing red LED at the reset switch plates.
   c. With the pocket intrusion key switches flashing red, have one operator turn and hold the slave key switch in the "on" position.
   d. The green LED on the master switch must not go on.
   e. Reset the pocket intrusion switches and have the operator turn and hold the slave key switch. The green LED on the master switch must go on.

## STAFF TRAINING

1. Provide a staff training procedure materials kit.
   a. For use at each building location which has electrically operated partitions in use.
   b. All school employees and all other persons who regularly make use of the area must be notified of the safe and proper procedure for the operation of the partition and safety system.
   c. Staff training procedure must be reviewed by the NYSED office of Facilities Planning and pre-determined that it is compliant with the latest regulations.
   d. Provide a staff training completion certificate for documentation of compliance, to be retained at appropriate building locations.

NOTES:
   a. The suggested service interval is once a year.

## ELECTRICALLY OPERATED PARTITION MAINTENANCE:

The Commissioner's Regulation 155.25, Safety requirements for Electrically Operated Partitions, reads in part:

   (d) Safety requirements and operation guidelines for electrically operated partitions. The board of education, trustees, principal and other person in charge of every public or private school or educational institution within the State shall ensure that:

   (2) A procedure is established for the notification of all school employees and all other persons who regularly make use of the area where such device is located of the safe and proper procedure for the operation of the mechanism. Records shall be maintained regarding the training provided.

   (4) Safety features shall not be tampered with, overridden or by-passed. All equipment must be maintained in accordance with the manufacturer's instructions, including the manufacturer's recommended service interval and records of such maintenance shall be permanently retained at the district or private school.

The Legislature requires these systems. It is imperative the school districts have installed and are maintaining them in the manner required.



# Installation, Operation and Maintenance

Passive Infrared
Safety Detection System

# TABLE OF CONTENTS

Installer Notes                                        Page No.

Prior to Installation.....:…………………….....………………..:........4

Installation

Installing the System Control Panel………………………..…………….5
Installing the Momentary Key Switch…………………………………...5-6
Installing the Passive Infrared (PIR) Sensors.........................................…...6

Operation and Testing

Testing the System……………………………………………………7
Demonstrating the System……………………………………………8

Troubleshooting...................………………………………………9

System components………………………………………….... 10

# INTRODUCTION

The Following Installation Instructions for the Safe Path™ Infrared Safety System are part of Gym Door Repairs' commitment to providing complete and accurate information about our products. However, we are constantly evaluating and improving our documentation to provide you with the answers you need.

If you have any suggestions for improvement of this document, send them to us at:

Gym Door Repairs, Inc.
685 E. Jericho Turnpike
Huntington Station, NY 11746

Thank you for choosing the Safe Path™ Infrared Safety System for operable partitions!

INSTALLER NOTES

---

### Prior to Installation

1. Inspect the job site conditions for any variations from original design.

2. The key control station must be a minimum distance of 78" from panel face at final closure and from the edge of the stacked panels at the panel storage area. If obstructions prohibit 78" minimum distance refer to the PIR installation instructions packaged with each PIR sensor.

3. Determine the new location and materials required.

4. If relocation of the key control station is to be done by others, the electrical contractor should complete the relocation prior to the system installation or perform the relocation during the system installation.

5. Inspect the proposed passive infrared (PIR) sensors coverage areas for any obstructions such as: Basketball backstops, scoreboards, lighting fixtures, trusses, beams, bleachers seating etc.

6. Relocate any obstructions or incorporate additional PIR sensors to achieve complete coverage.

7. Determine the mounting technique for each component, preparing fastening hardware and tools required.

8. Remove and identify each component from the system package. (Refer to components list on page 10).

9. Determine all required tools, equipment, etc. and prepare work area (s) for installation.

NOTE: All installations must conform with local electric codes.

Caution – Shut off power at fused disconnect and/or circuit breaker panel prior to performing any electrical hook-ups.

## Installing the System Control Panel

position and mount the control panel near the electric motor controls. Perform wiring per wiring diagram specifications. (See Wiring-At-A-Glance Diagram)

NOTE:   Wiring hook-up (cut-in) will be achieved through key control switch(es) as per wiring diagram specifications. Retro-fit applications vary and cut-in may have to be achieved through key control switch(es), circuit(s), motor circuit(s) or stack and extend limit switches.

## Installing the momentary key switch

Wire system control panel to key control station per wiring diagram specifications. (See Wiring at-a-glance diagram.)

NOTE:   New installation must have suitable raceways/conduits for both the momentary key switch (controls safety system with 16 VAC wiring) and the key control switch (controls operable wall with 120 VAC wiring).

NOTE:   Retro-fit installations may require additional raceways/conduits to achieve local electrical code compliance.

NOTE:   Many locations have or require dual key control stations for each run. If these are wired in series, (both must be activated simultaneously for operation) run wiring from system control panel to one (1) of the switches only. (The nearest or more convenient switch.) If these are wired in parallel, (either switch can be activated independently for operation) an additional momentary key switch is required and wiring must be run from system control panel to each key control station.

## Installing the Passive Infrared (PIR) Sensors

NOTE:   Application is very flexible as units can be wall or ceiling mounted and additional units can be used to achieve complete coverage where obstructions may be present.

- Determine location of each PIR sensor as per following guidelines:
- Review the separate PIR sensor instruction manual prior to installation (within each PIR sensor box).
- Familiarize your self with the PIR sensor coverage and range diagram.

NOTE:   Wall mounted units should be mounted no less than 12'0" from the floor. (12'0" heights is recommended as it provides optimum coverage.)

5

- Protection zone coverage must be as close as possible to panel faces at final closure and edge of stacked panels at panel storage area(s).

NOTE:    In some conditions, moving panels will activate a PIR sensor. This is unacceptable and PIR sensor(s) must be adjusted accordingly. Refer to the PIR installation instructions packaged with each PIR sensor.

- the final width of each protection zone is 6 ft. This is figured at a 100 ft. length run and width will decrease as length of run decreases.
- Length of run I X.06 = final protection zone width.

NOTE:    The critical coverage area will be at the opposite wall of each mounted sensor . These measurements must be transferred to the opposite wall for correct mounting location at each sensor.

- Determine half the distance of the final protection zone width and add 2" tolerance for locating the center of the PIR sensor mounting position. (Remember measurements must be transferred to opposite side.)

SAMPLE:    100 FT. length RUN
100 ft x .06 = 6 ft. divided by 2 = 36" +2" = 38" from the face or edge of the operable partition surface.

- Mount PIR sensor at determined distance from each side of the partition.
- Perform wiring per wiring diagram specifications. (see wiring-at-a-glance diagram.)

NOTE:    If pocket doors or other obstructions exist, simply mount PIR sensors near the desired location as they are very adjustable and can achieve protection zone coverage in a variety of ways.

NOTE:    Creating complete protection zone coverage is the most important step in this system 's installation as the entire system relies on each PIR sensor.

OPERATION AND TESTING

Testing the System

- When wiring hook-up is complete, turn on power at fused disconnect and/or circuit breaker pane

- Each (PIR) sensor will require several minutes to automatically set-up.  This can be observed by viewing the two indicator lights at each unit which will blink during the set-up period.  When ready at each unit for operation these indicators will only light when a sensor is triggered.

- The momentary key switch indicator will illuminate the green LED when the system is ready for arming.  The protection zone is now clear and no obstruction is present.

- The momentary key switch will not illuminate the green LED when the system detects an obstruction and can not be armed until the protection zone is clear.

- When the green LED is illuminated, the system can be armed by turning the system control key 90° clockwise and immediately back to original position.  The red LED will also illuminate and the entire system is ready for operation.

- When both the red and green LED's are illuminated you can now operate the wall.  Completely extend and stack the partition, making sure moving panels do not disturb protection zones and trigger sensors.

- Operate the wall again, this item one installer must enter the protection zones as the wall is moving.  As a protection zone is entered, the PIR sensor should trigger system to an alarm condition causing operation to stop immediately and activate the siren.

- The system must be reset at this point by turning the key 90° clockwise and immediately back to the original position.

- Stack the partition and walk-test the entire run at each protection zone as follows:

- 2 persons required – 1 at key control station.  1 at protection zone as follows:

- Triggering of the PIR sensors can be observed at the key control station as the green LED will go out when a protection zone is disturbed and the PIR sensor triggers the system to alarm condition.  As the light goes on and off the observer must communicate this each time to walk-test person.

- Begin at one extreme end of the run outside the protection zone.

- Walk across the protection zone (perpendicular to length of the run) into the center of the run directly under the track.

7

NOTE: The PIR sensor(s) must trigger with each pass. If they do not, adjust the sensor(s) accordingly.

- Continue the walk-test crossing the protection zone at the other side of the run to just outside the protection zone.

- Move approximately 12" towards the opposite end of the run after each complete pass and repeat the walk-test procedure until the far end is reached.

- There should be no passable voids in the protection zones.

- Check the following conditions at each PIR sensor:

  1. Sensitivity adjustment (turn clockwise to H).
  2. Adjustment of the field of view (Rotate head unit back toward body. LED at head unit will not be visible.)
  3. Switch for indicator lights is in the ON position.

NOTE: For the above features, refer to the manufacturers' PIR installation manual.

- Install protective covers directly over each PIR sensor (each mounted to wall or ceiling independently).

- A mounting template sheet is provided.

- Operate as required, confirming that the entire system is functioning properly.

Demonstrating the system

- Contact appropriate building owner personnel to arrange a demonstration of proper and safe operating procedures.

- Demonstrate and explain complete operation of system.

- Complete installation date and distributor information in the owners manual.

- Issue two system arming keys and one owners manual (these are provided with each system).

8

# TROUBLESHOOTING

System does not operate.  (Green LED does not light)

- Check the power at the circuit breaker or fused disconnect and make sure that the operating area is clear of any obstructions.

- Check terminal connections in the system control panel to ensure proper connection.

- If connections are correct install a jumper wire between POS and CC loop terminal.  If green LED lights, the malfunction is in the PIR loop.

- Check to ensure that the PIR sensors are connected on terminals #3 and #4.

- Check PIR sensors rotating head unit for correct position.

- If stack area PIR sensors are not used, install jumper wires at POS and pocket sensors CC loop.

System activates alarm and halts partition when no person has passed.

- Check to ensure that there is no heat source in the operating area causing a rapid temperature change and that the partition panels are not interfering with the PIR sensors protection zone.*

System does not activate when entering PIR protection zone.

- Ensure that the field of view and the protection zone settings are adjusted properly and that the PIR sensor sensitivity setting is set to the high setting.*

LED indicators light but partition does not operate.

- Check PIR sensors rotating head unit for correct position.

- Check the reversing starter control for the partition to ensure proper operation.

- If stack area PIR sensors are not used, install jumper wire at POS and pocket sensors CC loop.

- Refer to PIR installation instructions and troubleshooting guide packaged with each PIR sensor.

FOR ANY ADDITIONAL TECHNICAL SUPPORT, CONTACT GYM DOOR REPAIRS, INC FIELD SERVICE AT (631) 549-8745.

## SYSTEM COMPONENTS

1       System control panel

1       Momentary key switch

2       Momentary key switch keys

1       Key switch plate with 2 LED's

4       Passive infrared detectors (long range)

4       Protective detector covers

2       Stack area passive infrared detectors

1       Panel box security tag

1       Installation operation and maintenance manual

1       Owners manual

1       Wiring-At-A-Glance diagram

 **OPTEX**

### INSTALLATION INSTRUCTIONS
No.0881

**PASSIVE INFRARED DETECTOR**
# SP-80 AM

CE

## FEATURES

- Double Conductive Shielding of the pyroelectric element
- Extremely High Light and RFI Immunity (Patent listed)
- Multifocus Optics Design (Patent listed)
- LED On/Off Switch
- Super Quad Zone Logic
- Temperature Compensation
- Sealed Optics
- Silent Relay
- LED Remote Control Terminal ((BE) model only)

- Advanced Anti-Masking Technology
- Self-check
- Alarm Memory and Initial Alarm Memory
- LED Remote Control Terminal
- 2 LED Indication

OPTION LONG RANGE LENS : CL-80N
FA-1W : Wall Mount Bracket : adjustable ±45° (Horizontally), 0-20° (Vertically downwards)
FA-3  · Compact Wall & Ceiling Bracket : adjustable ±45° (Horizontally), 0-10° (Vertically downwards)

## 1. INSTALLATION HINTS


Avoid direct sunlight


Avoid mounting detector where movement of Fans or Air Conditioning Fans can be detected.


Avoid vapor or high humidity that can cause condensation.


Avoid Curtain,Screen,etc. blocking detection area.


Do not install outdoors

1.E
⚠ **WARNING**
Never repair or modify product. It may cause accident, fire hazard or electric shock.

⚠ **WARNING**
When damage has occured to the product, i.e. water logged, abnormal things inside product, overheating or smoking, strange smells etc., immediately stop using product and contact your supplier. Otherwise, continued use in such condition may cause electric shock or fire hazard.

1.G
⚠ **CAUTION**
Mount securely. A falling product may cause injury.

## 2. DETECTION AREA

STACK AREA
WIDE ANGLE



LONG RANGE

**IMPORTANT**
When using the optional "Long" range lens, ensure that the detection mode switch is set to the "STD" position.

Ensure that the SENS Switch is set to the "H" position when the detector is to be used in ranges longer than 67ft(20m).



## 3. DESCRIPTION AND OPERATION



Cover

Anti-masking prism
Do not touch.

Terminals

Lens

LED Indicator

Sensor
(Double Conductive Shield)
Do not touch.

Cover Fastening Screw

Sensitivity Selector
(See section 6-1)

Base

Tamper switch



Wiring Knockout

Corner mount Knockout

Mounting Knockout
Pitch 2.99inch(76mm)

## 4.INSTALLATION



**1** Loosen fastening screw and remove cover.

**2** The main unit can be released from it's base by following the procedure below.

Push up the main unit until it is released from the claws of the base housing Pull the unit out from the base, setting the guides on the both sides of the upper part of the main unit with the claws of the base housing.

**3**   Lead in wires through knockouts along the wiring guide on the rear side of base. Mount base with supplied screws. When using a bracket, check matching knockout position before opening mounting holes.

**4**  Wire according to Section 5.

**5**  When using the "Long range" lens or to get access to the sensitivity selector switch it is necessary to remove the lens.

This is done by releasing it from the two notches either side of the lens and pulling away.
To replace it, line up the lens with the guides on the inner cover of the detector and hook the holes back into the claws.
* Long Range Lens CL-80N which has the number , "51-1622" engraved inside the lens.

**6**  claws guides

Line up the guides on both sides of the upper part of the main unit with the claws of the base housing. Push it onto the base housing and slide down the main unit locking them together

**7**  Conduct a walktest and make adjustments. (Section 8) Fit cover using fastening screw.

## 5.WIRING

### SP-80AM

INITIAL ALARM MEMORY

TROUBLE OUTPUT (N.C.) | ALARM MEMORY

ALARM OUTPUT (N.C.) | D.L. Disable" LED

POWER INPUT (9~18VDC) | SPARE | TAMPER(N.C.)

[ Connect tamper terminals to a 24 hour supervisory loop. ]

Power wires should not exceed the following

| WIRE SIZE | SP-80AM | |
|---|---|---|
| | 12V | 14V |
| AWG 22(0.33mm²) | 1050ft (320m) | 2120ft (640m) |
| AWG 20(0.52mm²) | 1660ft (500m) | 3320ft (1000m) |
| AWG 18(0.83mm²) | 2660ft (800m) | 5320ft (1600m) |

When using two or more units on one wire, the maximum length is obtained by dividing the maximum wire length listed above by the number of units used.

*UL requires SP-80AM to be connected to a UL listed power supply capable of providing a nominal input of 12VDC 19mA(max.) and battery standby time of 4 hours.

*The equipment shall be installed in accordance with the National Electrical Code, NFPA 70.

## 6.FUNCTIONS



**DIP SWITCH**
·TROUBLE OUTPUT SELECTOR
·POLARITY SELECTOR
·DETECTION MODE
·LED ON/OFF

**SENSITIVITY SELECTOR**

**CAUTION!**
Always conduct a walk test after changing the position of this switch to ensure the detector is still providing optimum coverage.

### 1. SENSITIVITY SELECTOR

To adjust the sensitivity , first remove the lens (as this covers the sensitivity switch).See the procedure on 4-5.
This switch may be used where:
A) Turn the switch to "L" (Low) position when the detector is installed in a hostile area, which may cause a false alarm.
It may be used in situations where the area of coverage may be small or narrow.
Where small animals may be present or where there may be sudden temperature changes.
B) Turn the switch to "H" (High) position when greater sensitivity is required, example (in Long Range applications exceeding 67ft (20m), areas with high temperatures which reduce the temperature difference between the target and background, or when the detector is mounted at higher than 9ft (2.7m).

### 2. LED ON / OFF
Dip SW 1 – Switches the LED "ON" or "OFF".
SP-80AM
1) When the system is armed, the Alarm LED and Trouble LED will not work regardless of the position of this DIP Switch.
2) When the system is disarmed, the Alarm LED and Trouble LED can be selectable to be either "ON" or "OFF"
See the section 6-5 as to the setting of "Arm / Disarm".
When in warm-up mode, the LED's are activated regardless of the DIP Switch's position.

 ON - OFF

* D.L. terminal / LED remote control terminal LED can be enabled or disabled remotely from control panel by D.L. terminal.
* Ensure to switch off the LED's "ON / OFF" switch

## 3. DETECTION MODE (PULSE COUNT)

The Detection Mode can be switched to either "Standard" or "Special" mode depending on the environmental conditions of the installation.
*Ensure that the "STD" position is used when the "Long" range lens is fitted.

STD : For normal applications.
SP  : For use in hostile areas where there may be movement from small animals or other objects such as fax machines or curtains.


SP – STD

When the "SP" is selected, the detector's sensitivity may seem sluggish. It is therefore important to always conduct a walk test to ensure that the desired coverage is given.

## 4. ALARM MEMORY and INITIAL ALARM MEMORY

**Alarm Memory**
This function is used to indicate if the detector was activated while the panel was armed. It will cause the red LED on the Detector to illuminate once the panel has been disarmed.

**Initial Alarm Memory**
When several detectors are on the same loop with the alarm memory function, after disarming:
1) The first detector to be activated flashes its LED.
2) On any subsequent detectors that became activated the red LED will stay on.

**Operation**
The LED display for the Alarm Memory and the Initial Alarm Memory turns "ON" only when the LED SW or remote control by the DL terminal is "OFF" while the system is in the disarm condition.

• Alarm Memory and Initial Alarm Memory will not activate while system is disarmed.
• After Alarm Memory and Initial Alarm Memory latches, Alarm Output operate normally during armed period.

**RESET**
Alarm Memory resets automatically when system is re-armed.
I- Wiring of Alarm Memory
- Compatible Control Panel is required for Alarm Memory.
- Connect A.M. terminal to Control Panel's Control Voltage
- Signal terminal (System Arming Status Voltage Output).
- See the section 6-5 as to the switching of System Status.

- Wiring of Initial Alarm Memory
Connect I.A. terminals of the detectors in one loop.(Parallel Connection)
NOTE:Maximum 40 detectors can be connected in one loop for initial alarm memory.


Control Panel    I.A. A.M.    I.A. A.M.    I.A. A.M.

## 5. POLARITY SELECTOR

This allows detector to be used with a variety of control panel memory latch outputs for either + or – switching. The memory latch from the panel may be either with the DL function or the Alarm Memory.

(Please note that you cannot set the polarities of these two functions separately.)
Please select " + " or " – " to meet with that of the control panels memory latch output.


POSI - NEGA

| Switch Position | Terminal input status | DL operation | ALARM MEMORY operation |
|---|---|---|---|
| POSITIVE | OPEN or +5~18VDC | ON | Armed |
| | 0~1VDC(grounded) | OFF | Disarmed |
| NEGATIVE | OPEN or +5~18VDC | OFF | Disarmed |
| | 0~1VDC(grounded) | ON | Armed |

"grounded" = A.M. and D.L. terminals are electrically connected with power supply terminal (ground).

## 6. ANTI-MASKING and SELF-CHECK

The Anti-Masking function protects the detector's lens from being covered by either an object or from hostile substances such as spray, therefore allowing it to detect to its specifications.

The Self-Check function is an onboard circuit, which checks the operation of Detector at regular 5 hour intervals. This ensures that the unit is always Working correctly.

**Trouble output: (TO)**
This output activates if there is either an Anti-masking detection or a Self-Check problem.

**Switching the Trouble Output**
In the Event of either a Masking or Self-Check problem, then the unit may be set to either activate just the Trouble output or the Trouble and the Alarm outputs. Using DIP Switch 4 makes this selection.


T.O.+ALARM· ·T.O.

| SWTICH POSITION | OUTPUT TERMINAL |
|---|---|
| OFF | TROUBLE(T.O.) |
| ON | TROUBLE(T.O.) and ALARM |

**LED display**
As well as the trouble output, the yellow LED on the detector will also display the trouble condition.

| Type of Trouble | Yellow LED Indication |
|---|---|
| Anti-Masking | Blinks slowly (0.5sec) |
| Self-Check | It lights constantly |
| Anti-Masking and Self-Check | Blinks fast (0.2sec) |

This function is displayed only when the LED ON / OFF switch or the Remote Control from the DL terminals is "ON" while the system is disarmed.

**Anti-Masking.**
If an object is placed within 10cm in front of the detector, for a period of more than 10 seconds then the Anti-Masking circuit will activate, triggering the Trouble output.
When the object is removed away from the lens, and then the Anti-Mask circuit will automatically be reset after one second, switching off the LED indication as well as the Trouble output.

**Caution on Installation.**
Since the accuracy of the anti-masking detection is very critical, please take note of the following points.
1) Installation.
Avoid locating the detector where any objects can be within 1 meter from the detector such as by doors, hanging signs or curtains. Also avoid locating the detector where it may be in direct or reflected sunlight.
2) Powering up the Detector.
This type of detector sets its optimum level of performance automatically during warm-up period. This enables it to be set up correctly to provide reliable performance with the minimum of fuss.
To ensure that this setting up is carried out properly, please follow the following instructions carefully.
A)- Keep at least 1 meter away from the detector when first applying the power to the unit.
B)-Keep at least 1 meter from the detector clear of any objects when first applying the power.

**Testing the Detector**
1) Ensure that all of the above procedures have been carried out, then apply power to the detector.
2) The detector will go through a warm-up period during which the display LED's will blink. (The Anti-Masking circuit will also start to set itself to its optimum level at this point).
3) When the LED's stop blinking the detector is set and ready for use. (If the LED's continue to blink then refer to the trouble shooting section).
4) Place an obstacle such as hand within 10cm in front of the detector for more than 10 seconds.
5) The detector works correctly if the yellow LED starts to blink slowly, indicating that it has been masked.
6) Remove the obstruction and the yellow LED should stop flashing. This completes the set up procedure.

## 7.TROUBLE SHOOTING

| PROBLEM | PROBABLE CAUSE | REMEDY |
|---|---|---|
| RED LED does not light. | Improper power supply voltage. (disconnection,low voltage) | Correct supply voltage to 9~18V DC. |
| | Improper detection area. | [See Section 2~4]. |
| | LED switch is OFF. | Turn on the switch. |
| | Improper polarity to detector. | Switch positive and negative at terminal. |
| RED LED lights even though no person within area. | Moving object within area. (curtain, wall hanging, etc.) | Remove the souces from the detection area. |
| | Temperature of object within area changing rapidly (heater, air conditioning, etc.) | Remove object from detection area. |
| RED LED lights but signal is not sent. | | Check load of output. |
| | Relay contact is stuck or damaged due to overloading | The unit needs repair or replacement. |
| Red LED does not stop flickering (warm-up) | Faulty wiring. | Wire correctly. |
| | Insufficient power supply. | Correct supply voltage to 9~18V DC. |
| Yellow LED flickers | Detector is masked. | Remove masking material and continuous double flickering of Red LED stops after several seconds. |
| | Strong light, electrical noise cause anti-masking false alarm. | Remove such causes. |
| Red and Yellow LED does not stop flickering.(warm-up) | Incorrect initialization | Initialize correctly according to [Section 6-6]. |
| | Insufficient power supply. | Correct supply voltage to 9~18V DC. |

## 8.SPECIFICATIONS

| Model | SP-80AM |
|---|---|
| Detection method | Passive infrared |
| Coverage | Wide angle 85° wide. 50ft x 50ft   (15m x 15m) |
| Detection zones | 82 zones |
| Mounting height | 6 ~ 10ft(1.8 ~ 3.0m) |
| Sensitivity | 3° F (1.6° C) at 2ft / sec (0.6m/sec) |
| Detectable speed | 1~ 5ft / sec (0.3 ~ 1.5m/sec) |
| Power input | 9 ~ 18VDC |
| Current draw | 7mA(normal) / 19mA(max.) |
| Alarm period | 2.0 ± 0.5sec |
| Alarm output | N.C. 28VDC 0.2A max. |
| Alarm Memory | See Section6-4 |
| Initial Alarm Memory | See Section6-4 |
| Tamper switch | N.C. Opens when cover is removed. |
| Warm-up period | Approx. 1 min.(LED blinks) |
| LED Indicator | Red and Yellow LED is blinking during warm-up period<br>Red LED-Alarm , Alarm Memory and Initial Alarm Memory indicator<br>Yellow LED-Anti Masking , Self-check indicator |
| Trouble output | N.C. 28VDC 0.2A max. |
| D.L.terminal | See Section6-2 |
| RF interference | No alarm 30V/m |
| Operating temperature | -4°F ~ +122°F(-20°C ~ +50°C) |
| Environment humidity | 95% max. |
| Weight | 4.8oz(135g) |



2.76(70)

4.53 (115)

2.06 (52.3)

Dimensions : Inches (mm)

### CL-80N  ( Optional lens for long range curtain pattern )

| Coverage | 80ft x 7.7ft   (24m x 2.3m) |
|---|---|
| Detection zones | 22 zones |

*Specifications and design are subject to change without prior notice.

NOTE

This unit is designed to detect movement of an intruder and activate an
alarm control panel.
Being only part of a complete alarm system,we cannot accept
responsibility for any damages or other consequences resulting from an
intrusion.
This product confirms to the EMC Directive 89/336 EEC

No.0881 0001-11           59-0881-1   00-03

 OPTEX

OPTEX CO., LTD. (ISO 9001 Certified by LROA)
4-7-3 Nionohama Otsu, 520-0801 Japan
TEL (077)324-6047  FAX (077)322-9022

OPTEX INCORPORATED
1845W. 205th Street Torrance, CA 90501-1510 U.S.A.
TEL (310)533-1600  FAX (310)533-5910

OPTEX (EUROPE) LTD. (ISO 9002 Certified by NQA)
Clereons Road, Cordwalls Park, Maidenhead, Berkshire, SL6 7BU U.K.
TEL (01628)631000  FAX (01628)636311



SAFE PATH WIRING DIAGRAM

SCALE: N.T.S.

NOTES:
1. POCKET DETECTORS SHALL BE WIRED IN SERIES WITH LONG-RANGE DETECTORS.
2. ALL LOW VOLTAGE WIRING SHALL BE #6 GAGE THHN.

NOTE: SIMULTANEOUS ACTIVATION REQUIRED.



# EXHIBIT 3

07/31/07                                    DESIGN NO._____

2.    Safety Edge: Leading edge of lead panel shall be
      equipped with safety edge which shall
      automatically stop operable wall in the event
      that its movement is obstructed in closing cycle. This
      safety edge shall be continuous (full height).
      Actuation force shall be 10 pounds.

3.    Stack Area Safety Sensor Mat:

      a.    Provide pressure sensitive safety mat to
            cover entire stack area which shall
            automatically stop operable wall in the event
            that any weight is detected in the area
            covered by the mat.

      b.    The pressure sensitive safety mat shall be as
            manufactured by Tapeswitch Corp., Farmingdale
            NY 11735, (631) 630-0442.

4.    Infra-red Safety Detection System:

      a.    The safety system shall create an infrared
            barrier on each side of the entire operating
            part of the partition so that the partition
            will immediately stop when an obstacle enters
            the path of travel. When an obstruction is
            detected, the partition shall automatically
            stop, regardless of the direction in which
            the partition is traveling, and an alarm
            shall sound. To restart the partition, the
            system must be manually restarted by use of
            the two safety key switches specified in Par.
            1 above.

      b.    The infra-red safety detection system shall
            be "Safe-Path" as manufactured by Gym Door
            Repairs, Inc., Huntington Station, NY - (631)
            549-8745.

2.03  WOOD FASCIAS AND SOFFITS:

      A.  Wood fascias and soffits around track and hanger rods,
          where applicable or as shown on the drawings. Fascias
          and soffits shall be Plain Sawn Appalachian red oak,
          clear first quality to match door veneer and shall be
          fire-retardant treated.

2.04  SHOP FINISH (WOOD VENEER)

      A.  Provide shop finish as follows for wood veneer on
          folding panel doors: (Provide finish varnish coat in
          field - See Section 09900).